*To be Argued by Michael H. Sussman*

# 24-11

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
--------------------------------------------------------
JOANNA LAISCELL,

*Plaintiff-Appellant,*

v.

BOARD OF EDUCATION, CITY OF HARTFORD,

*Defendant-Appellee.*
--------------------------------------------------------
**On Appeal from an Order and Judgment of the**
**United States District Court for the District of Connecticut**

---

## APPELLANT'S BRIEF-IN-CHIEF AND SPECIAL APPENDIX

---

SUSSMAN & GOLDMAN
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]
jgoldman@sussman.law
sussman1@sussman.law

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................... ii

PRELIMINARY STATEMENT ................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF ISSUES PRESENTED................................2

STATEMENT OF THE CASE................................................2

STATEMENT OF FACTS ....................................................4

    A. Background ........................................................4

    B. Laiscell applies for promotion to CFO .........................4

    C. The Dependent Eligibility Verification Audit ..................5

    D. Appellee investigates Laiscell and terminates her employment ....................7

    E. Procedural History ..............................................11

SUMMARY OF ARGUMENT ..............................................12

STANDARDS OF REVIEW ................................................13

ARGUMENT ....................................................................14

    Point I

    A reasonable jury could conclude from this record that the
    Board's asserted reasons for terminating Laiscell were pretextual
    and that, but for her CHRO complaint, it would not have fired her..............15

    A. Failure to remove an ineligible dependent from the healthcare plan .......17

    B. Failing to save or backup budget files....................................22

i

C. Deleting a sentence from Griffin's email .................................................26

CONCLUSION ....................................................................................................28

CERTIFICATE OF COMPLIANCE....................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................13

*Cronin v. Aetna Life Ins. Co.*,
    46 F.3d 196 (2d Cir. 1995) ..........................................................15

*Danzer v. Norden Systems, Inc.*,
    151 F.3d 50 (2d Cir. 1998) ..........................................................13

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000) ..........................................................19

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ........................................................14

*Holcomb v. Iona College*,
    521 F.3d 130 (2d Cir. 2008) ........................................................13

*Holtz v. Rockefeller & Co., Inc.*,
    258 F.3d 62 (2d Cir. 2001) ..........................................................15

*Kwan v. Andalex Grp., LLC*,
    737 F.3d 834 (2d Cir. 2013) ........................................................16

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)......................................................................14

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)..................................................14, 15, 16, 22

*Summa v. Hofstra Univ.*,
    708 F.3d 115 (2d Cir. 2013) ........................................................15

*Univ. of Tex. Southwestern Med. Ctr. v. Nasser*,
    570 U.S. 338 (2013)......................................................................15

iii

## <u>Statutes</u>

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

42 U.S.C. § 2000e ................................................................................1

42 U.S.C. § 2000e-5(f)(3) ....................................................................1

## <u>Federal Rules</u>

Fed. R. App. P. 4(a)(4)(A) ....................................................................1

Fed. R. Civ. P. 56(a) ...........................................................................13

## PRELIMINARY STATEMENT

Plaintiff-Appellant JoAnna Laiscell respectfully submits this brief in support of her appeal from the district court's grant of summary judgment dismissing her Title VII retaliation claim. Since a reasonable jury could find that the reasons Defendant-Appellee Board of Education, City of Hartford ("Appellee" or the "Board") asserted to support its decision to terminate Laiscell's employment were pretextual, and that it really fired her because she complained about race and gender discrimination, summary judgment on this claim was improper. This Court should reverse the district court's judgment and remand for trial on this claim.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

As Laiscell's claims arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the district court below had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). On September 22, 2023, the district court entered its order granting summary to Appellee and a judgment dismissing Laiscell's complaint. On October 10, 2023, Laiscell filed her motion for reconsideration of the district court's Order granting summary judgment, which the district court denied by Order dated and entered December 5, 2023. On December 25, 2023, Laiscell filed her notice of appeal. As such, this Court has appellate jurisdiction under 28 U.S.C. § 1291. *See also* Fed. R. App. P. 4(a)(4)(A).

## STATEMENT OF ISSUES PRESENTED

Whether a reasonable jury could conclude that Appellee's asserted reasons for terminating Laiscell's employment were pretextual and that, but for her complaints of race and gender discrimination, she would not have been fired?

## STATEMENT OF THE CASE

Plaintiff-Appellant Joanna Laiscell, an African American woman, was a longtime employee of the Appellee school district and had a positive performance history. In 2013, she was promoted to the position of Executive Director of Financial Management. In January 2018, Appellee's CFO resigned and recommended that Lasicell be promoted to replace her. As Appellee searched for a candidate to fill this position, it assigned Lasicell certain CFO duties on an interim basis. Laiscell formally applied for the position, along with several other candidates. Appellee chose a white male for the position over Lasicell.

On April 30, 2018, Laiscell filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging race and gender discrimination in the denial of this position. At the time, she had been placed on leave as Appellee investigated a complaint made against her by a subordinate.

On July 12, 2018, Appellee terminated Laiscell, asserting three reasons – that (1) she improperly kept an ineligible dependent (her ex-husband) on the school's healthcare plan, incurring $6,691 in costs to the district; (2) she deleted one sentence

2

from a subordinate's email when forwarding it to her superiors; and (3) she maintained budget files on her laptop without ensuring they were properly stored or backed up. On August 18, 2018, Laiscell filed a second CHRO complaint, alleging her termination was retaliation for her having filed her initial complaint.

Indeed, the three asserted reasons were pretextual because (1) the discovery of her ex-husband remaining on the school's health plan was made as part of a district-wide audit, which was not intended to be punitive and which found that dozens of other employees had kept hundreds of ineligible dependents on the plan, costing the district hundreds of thousands of dollars, and Laiscell was the only person Appellee then terminated for this; (2) Laiscell had the authority to revise her subordinate's work product, she contemporaneously told him she had done so, and her deletion of one sentence did not materially alter the overall message of his communication; and (3) any budget files on Laiscell's laptop (a work laptop owned by Appellee) were, in fact, properly stored and/or backed up.

On September 26, 2020. Laiscell commenced the underlying lawsuit in the District Court for the District of Connecticut, asserting two claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII") – that she was denied the CFO position because of her race and gender and that she was terminated in retaliation for her CHRO complaint. After discovery, Appellee moved for summary judgment, which the district court granted in its entirety. The

district court then denied Laiscell's motion for reconsideration of its summary judgment order, and Laiscell filed her notice of appeal. She now perfects her appeal and, in doing so, challenges only the dismissal of her Title VII retaliation claim.

## STATEMENT OF FACTS

### A. Background.

JoAnna Laiscell, an African American female, began working for Appellee in 1996 and, thereafter, was promoted several times, including, most recently in 2013 to her final position of Executive Director of Financial Management (JA-16 ¶ 5; JA-45 ¶ 5; JA-586 ¶¶ 2-3). The Appellee Board is responsible for operating the Hartford public school system (JA-15 ¶ 2; JA-45 ¶ 2). Prior to the events at issue in this mater, Laiscell received only positive performance reviews (JA-586 ¶ 5).

### B. Laiscell applies for promotion to CFO.

In January 2018, Appellee's Chief Financial Officer ("CFO") Paula Altieri resigned (JA-548). That same month, Appellee assigned to Laiscell duties of the CFO position on an interim basis as it sought to fill the position permanently (JA-586 ¶ 4). In this interim role, Appellee's Executive Director of Risk Management, John Griffin, reported to Laiscell (JA-205 ¶ 3; JA-587 ¶ 9).

Laiscell applied for the CFO position and Altieri provided her with a letter of recommendation (JA-301; JA-586 ¶¶ 5-6). On April 3, 2018, Appellee selected a white male, David Fleig, as its new CFO (JA-281 ¶ 21).

4

On April 30, 2018, in good faith, Laiscell filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging that she was not chosen for the promotion to CFO because of race and gender discrimination (JA-38-41; JA-324-27; JA-587 ¶ 8).

### C. The Dependent Eligibility Verification Audit.

In the 2017-2018 school year, the Board hired Secova, Inc. to conduct a dependent eligibility verification audit (the "Audit") (JA-17 ¶ 18; JA-47 ¶ 18; JA-284 ¶ 30). Through this Audit, Secova reviewed Appellee's healthcare plan to determine the eligibility of employee dependents enrolled in the plan (JA-17 ¶ 18; JA-47 ¶ 18). The audit was not intended to be punitive (JA-519-20).

In January 2018, Appellee notified all of its employees by email advising that this Audit would commence in February 2018 and that each employee would receive an information packet identifying their dependents enrolled in the plan and providing instructions on how to either verify them or voluntarily remove them by March 13, 2018. (JA-17 ¶¶ 20-22; JA-47-48 ¶¶ 20-22). Appellee also provided a further 30-day grace period, to April 13, 2018, for employees who did not respond by March 13 (JA-221).

On February 22, 2018, Griffin emailed Laiscell with an update on the Audit, advising of the further 30-day grace period, and further noting as follows:

> Based on hundreds of similar audits, Secova projects 1.5%
> of employees will not respond to provide proof of their

> dependents, they also project a dependent drop rate of 8%. Based on the above, about 27 employees with dependents may not respond to the audit and their dependents would consequently be dropped. Also, an estimated total of 320 dependents may be removed from the plan as a result of the audit. Thus far, ten dependents have been dropped voluntarily and we project this number to increase during the upcoming weeks. As noted in earlier communications, we found one ineligible dependent with claims totaling over $360,000. At the end of this project, we will save in excess of $1M.

(JA-221-22).

That same day, Laiscell notified Griffin that she had forwarded his email to Superintendent Leslie Torres-Rodriguez and Deputy Superintendent Alberto Vasquez-Matos and, in doing so, removed the following sentence: "Also, an estimated total of 320 dependents may be removed from the plan as a result of the audit" (JA-221). She remarked, "I hope that's not concerning to you" (*Id.*).

After discussing this with Laiscell, Griffin emailed her on February 25, 2018, suggesting that her deletion of this sentence from his email violated the district's "standard of conduct," but concluding, "We appreciate your support and look forward to helping you be successful in your new role" (JA-221).

On March 12, 20218, after having received her information packet indicating that her ex-husband was still enrolled as a dependent, Laiscell timely voluntarily removed him (JA-587 ¶ 11). Indeed, she had previously attempted to remove her

ex-husband by submitting paperwork to Benefits Specialist Elaine Bonfiglio; however, Bonfiglio failed to complete this task (JA-518; JA-558; JA-587 ¶ 11).

### D. Appellee investigates Laiscell and terminates her employment.

Four days later, on March 16, 2018, Griffin drafted a memorandum to Superintendent Torres-Rodriguez and Deputy Superintendent Vasquez-Matos (JA-224-58) accusing Laiscell of engaging in unethical and potentially fraudulent conduct by having failed previously to remove her ex-husband, resulting in the district paying, about $9,000 in health claims for him (JA-224). He also accused Laiscell of expressing hostility toward him about the audit and cited her removal of the sentence from his February 21, 2018 email, claiming that this violated the district's standard of conduct (JA-224-25). And he accused Laiscell of retaliating against him (JA-225-26). That same day, Appellee placed Laiscell on administrative leave while it investigated Griffin's accusations (JA-587 ¶ 13)

Appellee retained a forensic accounting firm to conduct its investigation of Laiscell (JA-19 ¶ 40; JA-50 ¶ 40). Appellee's Assistant Superintendent for Talent Management, Peter Dart, contacted Laiscell to arrange a meeting to obtain certain budget documents from her and to discuss the allegations against her (JA-19 ¶ 41; JA-50 ¶ 41). Laiscell attended this meeting on April 12, 2018 with a work colleague; she was denied the right to have her counsel also attend (JA-19 ¶¶ 42-44; JA-50 ¶¶ 42-44; JA-587 ¶ 15). Also in attendance were representatives of the forensic

7

accounting firm, whom Laiscell was not advised would be there (JA-19 ¶ 44; JA-50 ¶ 44; JA-587 ¶ 15). Laiscell cooperated fully at this meeting; however, she declined to answer accusatory questions posed by the forensic auditors without her attorney present (JA-572; JA-587 ¶ 16).

Although Griffin had accused Laiscell of harassment, intimidation and retaliation, Appellee did not charge the forensic accounting firm with investigating these allegations, and she was not so investigated. Instead, the inquiry focused primarily on Laiscell's failure to have removed her ex-husband from her healthcare plan (JA-20 ¶¶ 49-50; JA-51 ¶¶ 49-50; JA-587 ¶ 17).

On May 11, 2018, Appellee was served with a copy of Laiscell's April 30, 2018 CHRO complaint (JA-20 ¶ 47; JA-51 ¶ 47). On May 31, 2018, the forensic accounting firm submitted to Appellee its final report regarding its investigation of Laiscell (JA-268-75). Plaintiff attended a "pre-disciplinary hearing" on June 1 and 14, 2018 (JA-20 ¶ 53; JA-51 ¶ 53).

By letter dated July 12, 2018 from Superintendent Torres-Rodriguez, Appellee terminated Laiscell's employment, effective immediately (JA-20 ¶ 54; JA-51 ¶ 54; JA-189-90). In her letter, Superintendent Torres-Rodriguez cited three reasons for the decision:

> - You fraudulently maintained your ex-husband as an eligible dependent on Hartford Public Schools' healthcare plan, after your divorce on December 15, 2014 through March 12, 2018. As a result, your ex-

8

husband received healthcare services subsequent to December 15, 2014, and Hartford Public Schools paid claims relating to your ex-husband during the subsequent period, approximately $6,691.

- Mr. Griffin sent an email to you dated February 22, 2018 regarding the Dependent Verification – HBOE Health Plan. The email contained the sentence, "Also, an estimated total of 320 dependents may be removed from the plan as a result of the audit." You forwarded Mr. Griffin's email dated 2/22/18 to Dr. Alberto Vazquez-Matos and Dr. Leslie Torres-Rodriguez on February 22, 2018. However, when you forwarded that email, you removed the sentence, "Also, an estimated total of 320 dependents may be removed from the plan as a result of the audit" from Mr. Griffin's original email.

- You maintained certain Hartford Public Schools' budget files on your laptop. You further stated you did not maintain the files on any other Hartford Public Schools' computer network drives or folders and failed to identify how and if the budget files were backed up and protected.

(JA-189-90). The Superintendent's letter continued: "Your conduct is unacceptable and wholly unprofessional. Such conduct is particularly egregious given your stature and position held in the District as the Executive Director of Financial Management. In that role you received and were aware of very specific information related to the dependent audit and used your position to minimize the importance of the audit. Your misconduct cannot and will not be tolerated and has left me with no choice but to terminate your employment effective immediately" (JA-190).

By May 11, 2018, the auditors identified 176 dependents who either were voluntarily removed or otherwise identified as ineligible due to incomplete or no documentation, including 67 spousal dependents (JA- 18 ¶ 33; JA49 ¶ 33). Other than Laiscell, the Audit identified ten other employees for potential investigation (JA-18 ¶ 34; JA-49 ¶ 34). Dart testified that a list of 20-30 employees were of greatest concern, but he is not aware of any employee, other than Laiscell, who was investigated or put on leave (JA-573). Of the ten other employees on the auditor's list, two were ultimately excused through further investigation and seven were given written reprimands, contingent upon them repaying improper expenditures of between $29.17 and $23,490.06 (JA-21 ¶¶ 59-60; JA-52 ¶¶ 59-60; JA-338-43).

The last person identified by the Audit, Patricia Wakefield, an African American tenured teacher, had improperly retained her ex-husband on her plan for about a decade, resulting in *several hundred thousand dollars* of improper expenditures (JA-296 ¶ 73). But it was not until over a year later, on July 3, 2019, that Appellee moved to terminate Ms. Wakefield's tenure and employment (JA-379). This, of course, was well after August 24, 2018, when Laiscell filed her second CHRO complaint, alleging that she was terminated in retaliation for her initial complaint (JA-311-23), and, in doing so, noted that "[n]o other employees were terminated as a result of voluntarily disclosing and removing individuals from coverage during the audit" (JA-316 ¶ 22).

The responsibility to ensure that that the insurance plan remained accurate and that ineligible persons were not retained rested with, among others, Griffin (JA-523-24). Yet, despite the fact that over a hundred ineligible dependents remained on the plan, neither Griffin nor anybody else with responsibility over plan administration was investigated, written up, terminated, or otherwise held accountable (JA-524-25).

The Superintendent also claimed she terminated Laiscell, in part, because she improperly removed a sentence from Griffin's email. However, as his interim supervisor, Laiscell had authority to do so, and this action, about which she contemporaneously notified Griffin, did not materially alter the overall message of the email and, in any event, was included in other communications he already made to the Board's Finance Committee (JA-587 ¶ 9; JA-222; JA-219).

Finally, Laiscell expressly denies failing to properly store or backup her budget files, which were "backed up and protected on the City of Hartford MUNIS financial system and the Hartford Public Schools budget database, which updates automatically on a daily basis" (JA-588).

### E. Procedural History.

On September 26, 2020, Laiscell field her complaint in this action (JA-1-44). On January 12, 2021, Appellee filed its answer (JA-45-54). On August 24, 2022, Laiscell moved to amend her complaint (JA-9 Doc. No. 55). On November 30, 2022, the district court denied Laiscell's motion without prejudice to renew (JA-9 Doc.

No. 65), which she did on December 7, 2022 (JA-10 Doc. No. 66). On December 23, 2022, the district court denied Laiscell's motion to amend and, on January 18, 2023, denied Laiscell motion for reconsideration (JA-10 Doc. Nos. 69-70, 76).

On March 3, 2023, Appellee moved for summary judgment (JA-55-57). By Memorandum of Decision dated and entered September 22, 2023, the district court granted Appellee's summary judgment motion in its entirety and entered judgment that same day (SA-1-32). On October 10, 2023, Laiscell moved for reconsideration of the district court's summary judgment order (JA-595-96). By Ruling and Order dated and entered December 5, 2023, the district court denied Laiscell's motion (SA-33-36). On December 25, 2023, Laiscell filed her Notice of Appeal (JA-597-99).

## SUMMARY OF ARGUMENT

Respectfully, the district court erred in granting summary judgment dismissing Laiscell's Title VII retaliation claim because the record contains sufficient evidence from which a reasonable jury could conclude that the three reasons Appellee asserted to support its termination of Laiscell were pretextual and that, but for her CHRO complaint of race and gender discrimination, it would not have fired her. As such, summary judgment on this claim should have been denied, and this Court should reverse and remand for trial on this claim.

## STANDARD OF REVIEW

Summary judgment is appropriate only where the moving party establishes there is no genuine dispute as to any material fact, entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the suit and a dispute is genuine if reasonable minds may differ on its resolution. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a reasonable jury could return a verdict for the non-moving party, then summary judgment is inappropriate and the court must deny the motion. *See Id.* at 250.

The Court must view the record in the light most favorable to the non-moving party, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in [its] favor." *See Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Its function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ." *Id.* at 255. And "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).

Critically, the court should review the record as a whole and, in doing so, "must disregard all evidence favorable to the moving party that the jury is not

required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*

## ARGUMENT

Laiscell's Title VII retaliation claim is evaluated under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). She must first establish a *prima facie* case of retaliation by showing "(1) participation in a protected activity; (2) that [Appellee] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* This "burden . . . is '*de minimis*,' and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (quotations & citations omitted).

Establishing a *prima facie* case creates a presumption of retaliation, which Appellee may rebut by asserting a legitimate, non-discriminatory reason. *See Id.* If it meets this burden, Laiscell may prevail by demonstrating Appellee's asserted reason is merely a pretext for retaliation. *See Id.*; *Reeves*, 530 U.S. at 143.

Here, the district court correctly concluded that Laiscell established a *prima facie* case of retaliation, as she engaged in protected activity by filing her CHRO complaint alleging race and gender discrimination and Appellee fired her only two and half months later (SA-23-24). But respectfully, the district court erred in concluding that a reasonable jury could not find that the Board's asserted reasons for terminating Laiscell were pretextual.

## Point I

**A reasonable jury could conclude from this record that the Board's asserted reasons for terminating Laiscell were pretextual and that, but for her CHRO complaint, it would not have fired her.**

A plaintiff may establish pretext by showing that the defendant's asserted reason was false and the real reason was retaliation; however, she is not required to disprove defendant's proffered reason and, instead, need only establish that defendant would not have acted but for its improper motive. *See Univ. of Tex. Southwestern Med. Ctr. v. Nasser*, 570 U.S. 338, 362 (2013); *Reeves*, 530 U.S. at 147-48; *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). Indeed, a plaintiff may establish pretext by demonstrating either (1) "that a discriminatory motive, more likely than not, motivated the defendants," or (2) "by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the [adverse] action[]." *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013).

15

In doing so, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). Indeed, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves*, 530 U.S. at 147-48

In establishing but-for causation, a plaintiff is not required to "prove that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of retaliatory motive." *Kwan*, 737 F.3d at 846. Further, a "plaintiff may prove retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action" *Id.*

Here, Appellee asserted three reasons for its decision to terminate Laiscell: (1) she fraudulently maintained her ex-husband as a dependent on its healthcare plan from December 15, 2014 to March 12, 2018, causing the plan to pay $6,691 of ineligible claims; (2) she improperly deleted a sentence from Griffin's February 22,

2018 when forwarding it to the Superintendent and Deputy Superintendent; and (3) she maintained certain budget files on her laptop without saving or backing them up to its network (JA-189-90).

But a reasonable jury could disbelieve these reasons and find them pretextual and, respectfully, the district court erred in concluding otherwise and granting Appellee's motion. In Laiscell's July 12, 2018 termination letter, these asserted reasons are set forth in the foregoing order; however, because the district court addressed reasons one and three first, we analyze them in that order, addressing reason two last.

**A. Failure to remove an ineligible dependent from the healthcare plan.**

Below, Appellee relied most heavily on Laiscell's failure to remove her ex-husband from its healthcare plan, as this was the primary thrust of its investigation into her. But a reasonable jury could find that conduct was not a true basis for Appellee's decision to terminate Laiscell.

Most critically, through Griffin, Appellee admitted that the audit was *not intended to be punitive* (JA JA-519-20); rather, its purpose was to identify ineligible dependents still on the plan and to remove them as a cost-cutting measure. Indeed, the District identified dozens of employees, who had kept hundreds of ineligible dependents, costing the district hundreds of thousands of dollars of payments that

would not have been made had these dependents been timely removed (JA- 18 ¶ 33; JA49 ¶ 33; JA-296 ¶ 73).

Indeed, other than Laiscell, the Audit identified ten other employees for potential investigation (JA-18 ¶ 34; JA-49 ¶ 34). Dart also recalls a list of 20-30 employees who were of greatest concern, but he was not aware whether any of them were investigated or put on leave, as was Laiscell (JA-573). Of the ten employees on the Audit list, two were ultimately excused through further investigation and seven were given written reprimands, contingent upon the repaying improper expenditures of between $29.17 and $23,490.06 (JA-21 ¶¶ 59-60; JA-52 ¶¶ 59-60; JA-338-43).

The last person identified by the Audit, Patricia Wakefield, an African American tenured teacher, had improperly retained her ex-husband on her plan for about a decade, resulting in *several hundred thousand dollars* of improper expenditures (JA-296 ¶ 73). But it was not until over a year later, on July 3, 2019, that Appellee moved to terminate Ms. Wakefield's tenure and employment (JA-379). Of course, this occurred well after August 24, 2018, when Laiscell filed her second CHRO complaint, alleging that she was terminated in retaliation for her initial complaint (JA-311-23), and, in doing so, noted that "[n]o other employees were terminated as a result of voluntarily disclosing and removing individuals from coverage during the audit" (JA-316 ¶ 22).

A reasonable jury could find pretext from this disparate treatment as between Lasicell, who had only incurred $6,691 of ineligible payments due to her failure to remove her ex-husband, and these other employees, who also included several thousand dollars of payments and were not terminated or otherwise seriously disciplined. Further, while Appellee moved to terminate Ms. Wakefield through the statutory tenure removal process, it did not do so until more than a year after it concluded its Audit and fired Lasicell (JA-379). Again, this was well after Laiscell filed her second CHRO complaint, highlighting that no other employee had been terminated for similar conduct (JA-311-23; JA-316 ¶ 22). A reasonable jury could find that it so acted with regard to Ms. Wakefield to distance itself from any such disparate treatment claim.

The district court concluded that Laiscell was not similarly situated to any other employee found to have failed to remove an ineligible dependent and incurring unnecessary costs for Appellee because all of the other employees were lower level and/or tenured employees, and Lasicell was the only management employment and that "[c]onsidering the fact that the audit was not intended to be punitive and in light of the reasoning proffered in the termination letter . . . , a reasonable jury would conclude it was precisely Ms. Laiscell's position in leadership that made her conduct worthy of termination" (SA-26)

Respectfully, this conclusion impermissibly usurped the jury's role. Employees are similarly situated for purposes of a disparate treatment analysis when they are "similarly situated in all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "What constitutes 'all material respects' . . . varies from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains are similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40. This inquiry ordinarily presents a question of fact for a jury to resolve. *See Id.* at 39-40.

To be sure, Laiscell was a managerial employee in the finance department; however, a reasonable jury could find that this does not make her failure to have removed her ex-husband and causing $6,691 of unnecessary expenses any less severe than a tenured teacher or other employee's similar failure, particularly where such other employees caused far greater unnecessary expenses to the district. As such, and given that the Audit was not intended to be punitive, a reasonable jury could certainly find that Appellee engaged in disparate treatment when it terminated Laiscell and not these other employees.

Moreover, it is also notable that the responsibility to ensure that that the insurance plan remained accurate and that ineligible persons were not retained rested with, among others, Griffin (JA-523-24). Yet, despite the fact that over a hundred

20

ineligible dependents had remained on the plan, neither Griffin nor anybody else with responsibility to administer the plan was investigated, written up, terminated, or otherwise held accountable (JA-524-25). Griffin and the others responsible for ensuring accuracy were also high-level employees with financial responsibility, and so a reasonable jury could find them similarly situated to Laiscell and that Appellee treated them much more favorably than they did her.

Laiscell also averred that she had previously sought to remove her ex-husband from the relevant insurance policy and that another employee had failed to do so. She defended herself contemporaneously in this manner and a reasonable jury could also credit her account and hold her blameless for the continued presence of her ex-husband on her coverage.

In short, a reasonable jury could find that firing Laiscell for her oversight and the resulting $6,691 in unnecessary costs was not justified and, indeed, was not Appellee's true reason, particularly where the Audit was not intended to be punitive and Appellee did not similarly terminate or otherwise seriously discipline others who engaged in similarly serious conduct and, as to Wakefield, whose conduct was significantly more severe than Laiscell's, it did not act until over a year later, after Laiscell had emphasized to the CHRO that Appellee had not fired anyone else.

### B. Failing to save or backup budget files.

Appellee submits that Laiscell "maintained certain Hartford Public Schools' budget files on [her] laptop" and that she "did not maintain the files on any other Hartford Public Schools' computer network drives or folders, and failed to identify how and if the budget files were back up and protected" (JA-190).

But Laiscell expressly refutes this – she swore: "My budget files were backed up and protected on the City of Hartford MUNIS financial system and the Hartford Public Schools budget database, which updates automatically on a daily basis" (JA-588 ¶ 19). Moreover, it is undisputed that the laptop in question was a work laptop belonging to Appellee, not Laiscell's personal laptop (JA-22 ¶ 65; JA-52 ¶ 65), and so Appellee could have access to it any time it desired. This alone is sufficient to raise a question of fact as the truth of Appellee's asserted reason.

But beyond this, it is also notable that Appellee does not identify which specific files it claims were saved only on Laiscel's laptop and not otherwise stored or backed up elsewhere. Rather, it simply refers to the documents as "certain budgetary files" (JA-265 ¶ 10) without any further specification. Further, Appellee's assertion is based entirely on the conclusory testimony of interested witnesses, which the jury is hardly required to accept. *See Reeves*, 530 U.S. at 150-51 (noting, on summary judgment, court "must disregard all evidence favorable o the moving party that the jury is not required to believe."). Indeed, the record contains no

corroborating evidence for its claim – *i.e.*, no copies of any file directories from Laiscell's laptop or the District's storage system, or other forensic evidence, demonstrating that the (unspecified and unidentified) files in question were saved locally and not backed up. This lack of specificity raises questions as to Appellee's credibility and whether, in fact, this asserted reason is truthful.

Finally, the record is devoid of any policy, procedure, guideline, or directive prohibiting employees from saving files on their local hard drives or otherwise requiring such files to be saved in certain network locations or employees to comply with any particular backup/storage protocols.

In holding that Laiscell failed to establish that this asserted reason was pretextual, the district court reasoned as follows:

> Ms. Laiscell was responsible for $284 million in general funds, approximately $130 million in annual grant funds, and $80 million in risk-related funds such as worker's compensation and pensions. Given Ms. Laiscell's duties of developing and maintaining the Board's budget as well as overseeing the District's finances, the budget documents were critically important and her failure to save them on the shared drive could have been catastrophic if her laptop was lost or destroyed. This is especially problematic since the Board is subject to Freedom of Information Act requirements.

(SA-27 [citations omitted]).

Respectfully, this reasoning is misplaced for several reasons. First, it accepts as true that, in fact, Laiscell is guilty of what Appellee claims – that she failed to

save the budget files on the District's network – when Lasicell expressly refutes this. It also assumes that the subject documents were of "critical importance" and certainly subject to Freedom of Information Act requirements; however, like Appellee, the district court never identified the specific documents in question. Indeed, not every employee document is of "critical importance," and not every document is required to be disclosed under Connecticut's FOIA statute, which contains myriad exemptions from disclosure. *See*, *generally*, Conn. Gen Stat. § 1-210.  Without identifying what specific files were allegedly not properly saved, the district court impermissibly speculated and resolved factual questions that should be left for the jury.

Responding to Laiscell's argument that, in fact, she had properly saved and/or backed up her budget files, the district court concluded:

> The evidence [Laiscell] cites indicates that the District uses Microsoft OneDrive to automatically backup laptops. However, an individual could save a document locally (and not on the OneDrive) if she is not logged in to her OneDrive account or otherwise dismantles the synching function. Ms. Laiscell has not provided evidence that the documents discovered during the investigation were actually properly uploaded on the OneDrive. A fair reading of the evidence is that Ms. Laiscell maintained some financial records on her laptop's local hard drive as opposed to the Board's shared OneDrive, that some documents were not automatically uploaded onto the OneDrive, and that the laptop's local version was the only financial record of that type. If the Board had not investigated Ms. Laiscell, she could have deprived the

agency of its access to finances and of its ability to be
accountable for its financial management.

(SA-28). It also concluded:

> In her declaration, Ms. Laiscell also stated her "budget
> files were backed up an protected on the City of Hartford
> MUNIS financial system." MUNIS' function is unclear,
> but it is improbable that Ms. Lasicell would have saved all
> of her documents on a city-wide system that extended
> beyond her employer. Furthermore, as with the OneDrive,
> Ms. Laiscell did not provide evidence that the documents
> at issue were saved on MUNIS. Even if she had presented
> such evidence, the termination was based on other grounds
> as well.

(SA-28 n. 2). Respectfully, these conclusions also involved impermissible
speculation and fact-finding, exceeding the district court's scope of review on a
summary judgment motion. While the district court noted what it felt was a "fair
reading" of the record, a reasonable jury viewing this same summary judgment
record could disagree and, instead, believe Laiscell's sworn testimony that she
properly saved and backed up her files. In doubting Lasicell's assertion and, instead,
positing what may have actually happened, the district court impermissibly made
credibility determinations, drew inferences *against* Laiscell, and resolved this
legitimate factual dispute *against* the non-moving party.

In short, a reasonable jury could find that Laiscell did not fail to properly store
and backup her budget documents and, therefore, that this asserted reason is
pretextual.

**C. Deleting a sentence from Griffin's email.**

As for Appellee's third asserted reason, the district court stated that it "expresses no opinion about the altered e-mail issue" (SA-28). Indeed, it acknowledged that, as Griffin's supervisor, Laiscell "presumably would have authority to revise his work product" (*Id.*). And it noted that "neither party submitted any policies that were purportedly violated" and that Laiscell was "transparent insofar as she informed Mr. Griffin she deleted the sentence at issue . . . [and] [p]resumably . . . would have rectified the deletion if Mr. Griffin was concerned" (SA-29).

Despite these observations, and notwithstanding that it was not expressing an opinion on the issue, in what appears to be *dicta*, the district court continued to note that Laiscell "altered Mr. Griffin's e-mail, sent it to the Superintendent and Deputy Superintendent without notifying them she altered his e-mail, and did so without his consent" (SA-29). Thus, it concluded: "The record therefore indicates the Board believed in good faith that Ms. Laiscell committed misconduct" (*Id.*).

Respectfully, the district court's own analysis in this regard highlights that there are questions of fact as to the veracity of this asserted reason. Indeed, the record contains no policy or guideline suggesting that Laiscell's deletion of the sentence constituted "misconduct" and, as the district court aptly observed, Laiscell, as Griffin's interim supervisor, had authority to edit his work product, or at least a

26

reasonable jury could so find. Moreover, as the district court noted, Lasicell was plainly transparent about it, informing Griffin she had made this revision, which a jury could conclude she would not have done if she was doing something prohibited by Appellee or otherwise seeking to covertly undermine the Audit.

Moreover, a reasonable jury could find that deleting this specific sentence did not alter the overall message or meaning of the email and, in any event, the omitted sentence was included in other communications he already made to the Board's Finance Committee (JA-587 ¶ 9; JA-222; JA-219).

Thus, a reasonable jury could find that this asserted rationale is also pretextual.

\* \* \* \* \*

Finally, Laiscell's termination purports to be based upon the combination of three reasons. Thus, if this Court finds there are sufficient questions of fact as to whether any one of them is pretextual, this raises questions as the overall decision-making process, rendering summary judgment inappropriate and warranting reversal.

## CONCLUSION

For all of the foregoing reasons, the summary judgment dismissal of Laiscell's

Title VII retaliation claim should be reversed and the matter remanded for trial on

this claim.

Dated:     Goshen, New York
              April 24, 2024         Respectfully submitted,

                                   SUSSMAN & GOLDMAN
                                   *Attorneys for Plaintiff-Appellant*

                                   By:   /s/ Jonathan R. Goldman
                                       Jonathan R. Goldman, Esq.
                                       Michael H. Sussman, Esq.
                                       1 Railroad Avenue, Ste. 3
                                     P.O. Box 1005
                                   Goshen, New York 10924
                                   (845) 294-3991 [Tel.]
                                   (845) 294-1623 [Fax]
                                   jgoldman@sussman.law
                                   sussman1@sussman.law

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,116 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

# SPECIAL APPENDIX

## SPECIAL APPENDIX
## TABLE OF CONTENTS

Memorandum of Decision Granting Defendant's
Motion for Summary Judgment, dated September 22, 2023 .............................. SA-1

Judgment, dated September 22, 2023 .............................................................. SA-32

Ruling and Order denying Plaintiff's
Motion for Reconsideration, dated December 5, 2023 .................................... SA-33

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JoAnna Laiscell | : | |
| Plaintiff, | : | |
| | : | No. 20-cv-01463 (VLB) |
| v. | : | |
| | : | |
| Board of Education, *City of* | : | September 22, 2023 |
| *Hartford*, | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 82]**

Plaintiff JoAnna Laiscell, a Black woman who worked for the City of Hartford Board of Education's finance department for 15 years, alleges her employer discriminated against her when it failed to promote her to Chief Financial Operator ("CFO") and then terminated her in retaliation for filing a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Before the Court is Defendant's Motion for Summary Judgment. For the following reasons, the motion is GRANTED.

    I.      **BACKGROUND**

        A.    <u>Facts</u>

Plaintiff JoAnna Laiscell is a Black woman who lives in Connecticut. (Dkt. 1 (Compl.) ¶¶ 1, 5; Dkt. 15 (Ans.) ¶¶ 1, 5.) Defendant City of Hartford Board of Education ("Board") is a municipal corporation responsible for operating the Hartford Public School District ("District"). (*See* Dkt. 1 ¶ 2; Dkt. 15 ¶ 2.) The District's superintendent is Leslie Torres-Rodriguez, a Hispanic female. (Dkt. 87

(Pl.'s 56(a)(2) ¶ 27.)   Ms. Laiscell worked for the Board from 2003 until her termination on July 12, 2018. (Dkt. 1 ¶ 6; Dkt. 15 ¶ 6.)

In 2013, the Board promoted Ms. Laiscell to Executive Director of Financial Management, and she held this position until her termination. (Dkt. 1 ¶ 6; Dkt. 15 ¶ 6.) Ms. Laiscell's job duties included overseeing the District's finances, developing the budget, and maintaining the budget. (Dkt. 87 ¶ 4.)

The relevant facts in this case involve two separate issues that took place during the same time period. First, the CFO resigned in January 2018 and the Board initiated its standard hiring process to find her replacement. Ms. Laiscell applied and the Board interviewed her, but it chose another candidate. Second (and while the hiring process was ongoing), the Board conducted an audit of its employee health benefits plan to determine whether ineligible dependents were improperly covered. The audit revealed there were ineligible individuals covered by the plan, including Ms. Laiscell's former husband. It opened an independent investigation into Ms. Laiscell's conduct, placed her on leave, and ultimately terminated her. For organizational purposes, the Court will discuss these events separately because they relate to separate claims, even though they took place simultaneously.

### 1.   *Hiring the New CFO*

In January 2018, the Board's CFO, Paula Altieri, resigned. (Dkt. 87-22 (Pl.'s Tr. Altieri Depo.).) Ms. Laiscell, Deputy Superintendent Dr. Alberto Vasquez-Matos, and Maureen Coleman (whose title is not in the record) assumed her duties. (Dkt. 87-12 (Pl.'s Tr. Torres-Rodriguez Depo.) at 81:13–16.) In relevant part, one aspect

2

of Ms. Laiscell's new duties was to oversee the Risk Management department, including its Executive Director, John Griffin.  (Dkt. 83-7 (Pedneault Decl. & Ex. A) at Ex. A, Laiscell-000039.) The Board paid Ms. Laiscell a "stipend or differential" for her performance of additional job duties. (Dkt. 87-12 at 82:21–83:1.) On January 12, 2018, the Board posted the open CFO position. (Dkt. 1 ¶ 9; Dkt. 15 ¶ 9.)  Ms. Laiscell applied.   (Dkt. 1 ¶ 10; Dkt. 15 ¶ 10.)

To select the new CFO, the Board created a hiring panel. (Dkt. 87 ¶ 8.)  The panel included seven interviewers, and all of them were Board administrators who held different positions in different departments.  (*Id.*)  The race and sex demographics of these seven interviewers included one Black female, Natasha Banks (Executive Director of Talent Management); one Hispanic male, Dr. Vasquez-Matos; four White females, June Sellers, Yolanda Burt, Nancy Williams, Maureen Coleman (whose titles are not listed); and one White male, Victor Cristofaro (whose title is not listed).  (*Id.* ¶ 9.)  Ms. Laiscell knew each of these interviewers in their professional capacities, including when she previously served on a hiring panel with them. (*Id.* ¶¶ 10, 24.)

With respect to the interviews, the Board utilized its standard interview process.  (*Id.* ¶ 22.)  Each candidate was asked the same seven questions.  (Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.)  For each of the seven questions, every interviewer scored the candidate's answer on a scale of one to four, giving the candidate the potential to obtain 28 points from each interviewer. (Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.) When adding all interviewers' scores together, a candidate could obtain a total score of 196.  (*See*

3

Dkt. 1 ¶ 12; Dkt. 15 ¶ 12.)  Ms. Laiscell had previously been chosen for positions through this standard interview process. (Dkt. 87 ¶ 23.)

The hiring panel interviewed seven candidates, including Ms. Laiscell. (*Id.* ¶ 13; Dkt. 1 ¶ 10; Dkt. 15 ¶ 10.)  Out of all seven candidates, David Fleig, a White male, received the highest score of 157.5. (Dkt. 87 ¶ 15.)  Darrell Hill, a Black male, ranked second highest with a score of 137. (*Id.* ¶ 16.)  Ms. Laiscell received the third highest score with a score of 127. (*Id.* ¶ 17.)

The Board submitted a declaration from Ms. Banks. (Dkt. 83-2 (Banks Decl. & Exs.).)  She stated that it was regular practice for each interviewer to score each candidate "at the time of the interview," for the District to retain possession of the score sheets, and for the District to create a chart of all candidates' scores from each interviewer. (*Id.* at Decl. ¶¶ 16–17.)  The record includes the score sheets for Ms. Laiscell and the chosen candidate, Mr. Fleig, as well as the chart. (*See id.* at Exs. A (Interview Score Sheets) & B. (Chart).)  Notwithstanding the poor quality of the chart, the Court is able to discern that the documents confirm that Mr. Fleig ranked first, Mr. Hill ranked second, and Ms. Laiscell ranked third.

The hiring panel recommended that Superintendent Torres-Rodriguez interview Mr. Fleig. (Dkt. 83-2 at Decl. ¶ 17; Dkt. 83-4 (Torres-Rodriguez Decl. & Exs.) at Decl. ¶ 8.)  In addition to the fact that he received the highest score, Mr. Fleig also had experience forecasting, which was a skillset Superintendent Torres-Rodriguez wanted her new CFO to have. (*See* Dkt. 83-2 at Decl. ¶ 12 & Ex. A; Dkt. 83-4 at Decl. ¶ 6.)  Superintendent Torres-Rodriguez interviewed Mr. Fleig and recommended him to the Board. (Dkt. 83-4 at Decl. ¶¶ 9–10.)  She did not review

anyone else, as it was regular practice for the hiring panel to recommend only one individual. (*Id.* ¶¶ 11–12.) The Board hired Mr. Fleig on April 3, 2018. (Dkt. 87 ¶ 21.)

### 2. The Audit

On September 12, 2017, the Board's Finance Committee began discussing the possibility of auditing the dependents on the employee health benefits plan. (*See id.* ¶¶ 30–32, 35.) Ms. Laiscell was a member of the Finance Committee at that time and attended the meeting. (*Id.* ¶ 35.) Mr. Griffin proposed the audit. (*Id.* ¶¶ 37; Dkt. 87-19 (Pl.'s Tr. Griffin Depo.) at 43:1–4.) He circulated a memorandum to the Finance Committee that stated the following:

> There may be times throughout the year that current employees may have family status changes (i.e., marriage, divorce, birth of a child, etc.). When these qualifying events occur, employees may add or delete dependents by providing the same legal documents new hires are required to provide. To ensure all our 4,000 dependents currently being covered on the plan are eligible, we will be conducting a Dependent Eligibility Verification Audit to weed out ineligible dependents. Ineligible dependents have the potential to create serious financial burdens on the district.

(Dkt. 83-6 (Griffin Decl. & Exs.) at Ex. B (9/12/17 Mem.).) In January 2018, the Board sent an announcement to its employees, informing them that an audit would be conducted and instructing all employees to remove ineligible dependents by March 13, 2018. (Dkt. 87 ¶ 40; Dkt. 83-6 at Ex. D (2/26/18 E-mail).)

The process to remove an individual from the employee health benefits plan required the employee to submit a form to human resources. (Dkt. 87 ¶ 47.) Elaine Bonfiglio, Insurance and Benefits Specialist, was in charge of this process. (Dkt. 87-13 (Pl.'s Tr. Banks Depo.) at 22:7–17; Dkt. 87-19 at 98:20–25.) As a brief background, Ms. Laiscell had been married but divorced her husband in December

5

2014. (Dkt. 87 ¶ 45.) Ms. Laiscell was aware of this protocol when she got divorced, but there is no record of her submitting the required form. (*Id.* ¶ 48.) Ms. Laiscell testified, however, that she submitted the paperwork to Ms. Bonfiglio who failed to complete the task. (Dkt. 87-24 (Pl.'s Tr. Laiscell Depo.) at 126:3–20.)

The audit began on February 5, 2018. (Dkt. 83-6 at Ex. E (3/16/18 Mem.).) On February 22, 2018, at 4:08 pm, Mr. Griffin e-mailed Ms. Laiscell informing her that the deadline to drop dependents had been extended from March 13 to April 13. (*Id.*) He also outlined the projections:

> Based on hundreds of similar audits, Secova projects 1.5% of employees will not respond to requests to provide proof of their dependents, they also project a dependent drop rate of 8%....Also, an estimated total of 320 dependents may be removed from the plan as a result of this audit. Thus far, ten dependents have been dropped voluntarily and we project this number to increase during the upcoming weeks. As noted in earlier communication, we found one ineligible dependent with claims totaling over $360,000. At the end of this project, we will save in excess of $1M.

(*Id.*) Ms. Laiscell responded that she sent the e-mail to Superintendent Torres-Rodriguez and Deputy Superintendent Vasquez-Matos. She added: "I excluded [']Also, an estimated total of 320 dependents may be removed from the plan as a result of this audit.['] I hope that's not concerning to you." (*Id.*) The record does not provide any context as to why Mr. Griffin sent the original e-mail to Ms. Laiscell nor as to why Ms. Laiscell forwarded his e-mail to the District leaders. The next Monday, on February 25, Mr. Griffin responded to Ms. Laiscell's e-mail, stating that her alteration of his e-mail violated the "standard of conduct." (*Id.*)

On March 12, 2018, Ms. Laiscell timely removed her ex-husband from her employee health benefits plan. (*Id.* ¶¶ 48–49.) Four days later, Mr. Griffin drafted a letter to Superintendent Torres-Rodriguez and Deputy Superintendent Vasquez-

Matos, expressing concern that Ms. Laiscell likely engaged in unethical and potentially fraudulent behavior. (Dkt. 83-2 at Ex. C (3/16/18 Mem.).) In summary, he stated that Ms. Laiscell a) improperly left her ex-husband on her employee health benefits plan for several years; b) expressed frustration and "considerable hostility towards" him about the audit, including recommending that the audit be scrapped; c) altered an e-mail drafted by him and—after removing key information about the audit's purpose—forwarded it to the Superintendent and Deputy Superintendent; and d) criticized his performance on several projects. (*See id.*)

The same day, the Board placed Ms. Laiscell on paid administrative leave. (Dkt. 87 ¶ 59.) (Ms. Laiscell's placement on paid administrative leave occurred ten days after her interview for the CFO position. (Dkt. 1 ¶ 10; Dkt. 16 ¶ 10.)) The Board then hired an independent forensic accounting firm, Forensic Accounting Services, LLC ("FAS"), to investigate Ms. Laiscell. (Dkt. 87 ¶ 60; Dkt. 83-7 at Decl. ¶ 5.) In March, FAS received documents from the Board's counsel and several Board representatives, including Mr. Griffin. (Dkt. 87 ¶ 60.) FAS then interviewed Ms. Laiscell on April 12, 2018 with Deputy Superintendent Vasquez-Matos, Budget Manager Mark Williams, and Assistant Superintendent for Talent Management Peter Dart present. (*Id.* ¶ 61.) The Board had offered Mr. Fleig the CFO position nine days prior. (Dkt. 87 ¶ 21.)

On April 30, 2018, Ms. Laiscell filed a discrimination complaint with the CHRO, which she later amended after she was terminated. (Dkt. 87 ¶ 66.) She alleged that the Board discriminated against her on the basis of her race, color and sex when it placed her on paid administrative leave. (Dkt. 87-3 (Pl.'s Ex. B, CHRO

7

Filings) at Aff. ¶¶ 6, 23–35.) She also alleged the Board placed her on administrative leave to prevent her from obtaining the CFO position.[1] (*Id.*)

FAS issued a report on May 31, 2018. (*Id.* ¶ 14.) According to the declaration submitted by Stephen Pedneault, FAS' principal, the firm made several findings. First, it determined Ms. Laiscell's ex-husband was ineligible for coverage, but he had remained on the plan and incurred approximately $6,691 in claims. (Dkt. 83-7 at Decl. ¶ 11.) Second, it determined Ms. Laiscell had stored budget information locally instead of on the District's shared database, including budget files for which only she was responsible. (*Id.* ¶ 10.) Third, Ms. Laiscell was uncooperative during her interview on April 12, 2018, because she refused to give information or answer questions. (*Id.* ¶¶ 8–9.)

On June 1 and 14, 2018, the Board met with Ms. Laiscell about her employment. (Dkt. 87 ¶ 67.) The Board ultimately terminated Ms. Laiscell in a letter from Superintendent Torres-Rodriguez dated July 12, 2018. (*Id.* ¶ 68.) The letter summarized the June interviews as well as FAS' findings, and it documented the fact Ms. Laiscell kept her husband on her employee health benefits plan, failed to save her budget files on the shared drive, used her position to minimize the importance of the audit, and re-published an edited version of Mr. Griffin's e-mail without his consent. (Dkt. 83-4 at Ex. A (7/12/18 Ltr.).)   In the letter, Superintendent Torres-Rodriguez concluded Ms. Laiscell's conduct was "unacceptable and wholly unprofessional, stating: "Such conduct is particularly egregious given your stature

---

[1] Once Ms. Laiscell was terminated, she filed another CHRO complaint alleging her termination constituted discrimination on the basis of her race, color and sex and retaliation for filing her initial CHRO complaint. (*See id.*)

8

and position held in the District as the Executive Director of Financial Management. In that role, you received and were aware of very specific information related to the dependent audit and used your position to minimize the importance of the audit." (*Id.*)

Mr. Griffin testified that the audit was not intended to be punitive. (Dkt. 87-19 at 100:12–20.)  Rather, the Board assessed whether an employee's failure to remove an individual appeared to be intentional. (*Id.* at 101:11–24.) Superintendent Torres-Rodriguez testified that she received the audit results, which identified several employees with ineligible dependents. (Dkt. 87-16 (Pl.'s Tr. Torres-Rodriguez Depo.) at 31:10–16.)  Mr. Dart testified that approximately 20 to 30 employees had ineligible dependents and that he was not aware of any employees other than Ms. Laiscell who were placed on administrative leave or investigated. (Dkt. 87-25 (Pl.'s Tr. Dart Depo.) at 78:2–23.)

It is undisputed that the only other employees who included ineligible employees on their healthcare plans held positions at a lower level than Ms. Laiscell and were also union members. (*See* Dkt. 87 ¶ 72.) For example, Patricia Wakefield, a Black tenured teacher, improperly included her ex-husband who incurred several hundreds of thousands of dollars. (*Id.* ¶ 73.)  According to Superintendent Torres-Rodriguez and Ms. Banks, Ms. Wakefield informed the Board of this issue before the audit began. (Dkt. 83-2 at Decl. ¶ 36; Dkt. 83-4 at Decl. ¶ 25.)  The Board followed the state law's due process requirements afforded to tenured teachers facing termination. (Dkt. 87 ¶ 75.)  Before the Board could terminate Ms. Wakefield, she resigned. (*Id.* ¶ 76.)  There is nothing in the record to

9

show that the Board relied on any of these lower-level employees to assure the integrity of its financial affairs.  Furthermore, the record does not identify any other employees who caused the Board financial loss as a result of an ineligible dependent.

### B.   Evidence of John Griffin's Animus

Ms. Laiscell submitted an affidavit from Bridgette Lee who has worked as the Senior Risk Management and Wellness Coordinator since August 2017.  (Dkt. 89-2 (Lee Decl.) ¶ 2.)  Mr. Griffin was her direct supervisor, and Ms. Lee worked on the audit as his "right-hand person."  (*Id.* ¶¶ 3–4.)  According to her declaration, Mr. Griffin referred to Ms. Laiscell as a "black bitch" and stated, "he had a plan to get rid of her."  (*Id.* ¶ 7.)  Ms. Lee only observed Ms. Laiscell interact with Mr. Griffin once.  (*Id.* ¶ 22.)  She believes that Mr. Griffin's memorandum from March 2018—in which he complained about Ms. Laiscell harassing and bullying him—was fabricated to lead to Ms. Laiscell's termination.  (*Id.* ¶ 22.)  Ms. Lee also stated it was "well known throughout the department that Griffin had racist and sexist attitudes and beliefs, and that he acted these beliefs out at work."  (*Id.* ¶ 23.)

Ms. Lee stated that Griffin used his supervisory powers to require her to research information he could use against Ms. Laiscell.  (*Id.* ¶ 17.)  Mr. Griffin screamed at Ms. Lee, forced her to work extra hours and on weekends, and harassed her, which caused her to file two verbal complaints with Human Resources and Ms. Banks.  (*Id.* ¶¶ 11, 19.)  In response to one of the complaints, Ms. Banks stated, "I told him not to do this again."  (*Id.* ¶ 14.)  Ms. Banks also told Ms. Lee to "let it go" because Griffin had "dementia."  (*Id.* ¶ 27.)

10

Ms. Lee declared, "Once the plaintiff was terminated, Griffin had no more interest in the audit." (*Id.* ¶ 21.) However, Mr. Griffin testified that he resigned in April or May 2018, (Dkt. 87-19 at 12:3–12), i.e., around the time Ms. Laiscell was placed on leave but at least two months before she was terminated, (Dkt. 87 ¶ 68).

### C.   Procedural History

Ms. Laiscell initiated this action on September 26, 2020.  After defense counsel entered their appearances and the parties jointly filed their Rule 26(f) report, the Court issued a Scheduling Order that, in relevant part, set a discovery teleconference in September 2021 and made the discovery deadline October 20, 2021. (*See* Dkt. 20.)

The Court held the teleconference on September 13, 2021.  Based on the matters discussed, the Court amended its Scheduling Order and extended the discovery deadline six months to April 20, 2022. (*See* Dkt. 33.)  Thereafter, the parties jointly requested a discovery deadline extension three additional times, which the Court granted.  (*See* Dkt. 36, 39, 44.)  Ultimately, the Court issued its Fourth Scheduling Order, setting a final discovery deadline of August 19, 2022. (Dkt. 44.)

In addition to setting the new discovery deadline, the Court referred the parties for a settlement conference. (Dkt. 42.)  The parties attempted to settle the case on August 17, 2022, but were unsuccessful. (Dkt. 52.)  The next day, Plaintiff's counsel moved to disqualify the Board's counsel (*see* Dkt. 53), which the Court denied for failure to provide sufficient facts warranting relief (*see* Dkt. 64).

On August 24, 2022—five days after discovery closed—Plaintiff's counsel moved to amend the complaint. (Dkt. 55.) The Court denied this motion without prejudice, explaining counsel must provide evidence warranting relief. (Dkt. 65.)

Plaintiff's counsel filed the renewed motion for leave to amend the complaint on December 7, 2022. (Dkt. 66.) In this motion, counsel described newly discovered evidence that was "uncovered" during the deposition process, (see Dkt. 66-1 (Mem.) at 1), focusing on depositions of Superintendent Torres-Rodriguez, Bridgette Lee, and Guillermo Garcia. With respect to Superintendent Torres-Rodriguez, counsel described her as hostile, arrogant and evasive during her deposition, largely because she testified that she did not remember information counsel believed she should have remembered. (Id. at 6.) As for Ms. Lee and Mr. Garcia, counsel claimed that in February 2022 Mr. Garcia identified Ms. Lee for the first time and that her subsequent deposition in April 2022 revealed "strikingly similar" harassment and abuse as Ms. Laiscell's, "perpetuated by the same actors, with the blessing and assistance of the Board and its executives...." (Id. at 9.) Counsel also stated that some discovery remained outstanding, despite the fact that discovery was closed. (This Court permitted Plaintiff to file a motion to compel, but plaintiff's counsel elected not to do so. (See Dkt. 58 (Order).))

In moving to amend, counsel included the proposed amended complaint, which contained two structural changes. First, the proposed amended complaint would add Mr. Griffin, Ms. Banks, Superintendent Torres-Rodriguez, and Mr. Dart as defendants. (Dkt. 67 (Proposed Am. Compl.) Second, it would add ten counts under 42 U.S.C. §§ 1981, 1983, 1985 and 1986, as well as common law torts. While

12

several of the new counts are difficult to decipher and appear to be multiple counts within a count, in relevant part, plaintiff's counsel sought to add claims that she was subjected to a hostile work environment and that the audit and termination constituted discrimination on the basis of her race, color and sex. (*Id.*)

The Court denied the motion for leave to amend on December 23, 2022 for failure to show good cause under Federal Rule of Civil Procedure 15. (Dkt. 69 (citing Second Circuit precedent establishing that a court may deny leave to amend after a scheduling order deadline when the movant fails to establish good cause).) Specifically, the Court stated that the submitted deposition excerpts did not warrant adding new claims or parties. (*Id.* at 6.) The Court also concluded that the evidence did not warrant reopening discovery, as counsel lacked diligence in failing to move to compel discovery while the discovery period was open. (*Id.* at 7.) Plaintiff's counsel moved for the Court's reconsideration, which was denied. (Dkt. 76.)

After denying reconsideration, the Court issued the final Scheduling Order. (Dkt. 77.) The dispositive motion deadline was set for March 3, 2023, and the parties thereafter timely filed their summary judgment briefing.

## II.   LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court

13

is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed—such as where the evidence offered consists of conclusory assertions without further support in the record—summary judgment may lie. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III.   **DISCUSSION**

Courts analyze employment discrimination claims with the "now-familiar burden-shifting framework established by the Supreme Court in *McDonnell*

14

*Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). While it is the Court's duty to "ensure that employers do not act in a discriminatory fashion, [it does] not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014).

The *McDonnell Douglas* framework has three steps. First, it requires the plaintiff to establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802, of which the elements vary for each type of claim. The Second Circuit has noted that the burden to establish a *prima facie* case is "minimal" or "de minimis." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Second, if the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. The defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotations omitted).

Third, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination. *See McDonnell Douglas*, 411 U.S. at 804. "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of

15

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### A.   Failure to Promote

Laiscell claims that Defendant failed to promote her because she is a Black woman. (*See* Dkt. 1 ¶ 74 (alleging discriminatory failure to promote on the basis of race, color, sex).)  While her claim—commonly known as a "gender plus" claim— is rooted in the intersectionality of her sex and race identities, it is functionally equivalent to a Title VII based on one protected category.  The Second Circuit explained why in *Back v. Hastings on Hudson Union Free School District*: "The term 'sex plus' or 'gender plus' is simply a heuristic.  It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against . . . ."  365 F.3d 107, 118–19 (2d Cir. 2004); *see also Murray v. Town of Stratford*, 996 F. Supp. 2d 90 (D. Conn. 2014) (applying "gender plus" principle to a "gender plus race" Title VII claim).   The central question, therefore, is whether Defendant's failure to promote Ms. Laiscell was based on any one of her protected classes: race, color or gender.

The Board argues that Ms. Laiscell has not established a triable issue of fact as to her failure to promote claim for three reasons. First, Ms. Laiscell cannot point to evidence establishing the discriminatory intent element of her *prima facie* case. (*See* Dkt. 82-1 (Mem. Mot. Summ. J.) at 9–13.)  The Board presents evidence that it used a standardized hiring process, Ms. Laiscell had been promoted through this same hiring process, the interview panel was diverse, Ms. Laiscell personally knew

16

each interviewer and did not have any concerns about them, the seven final candidates were diverse and Ms. Laiscell was one of them, and Ms. Laiscell ranked third out of the seven finalists. (*Id.*) Second, the Board had a legitimate, non-discriminatory reason for hiring Mr. Fleig—a White man—over Ms. Laiscell: he received the highest score in the objective interview process. (*See id.* at 13–14.) Third, Ms. Laiscell cannot present evidence that the legitimate, non-discriminatory reason for hiring Mr. Fleig was pretextual. (*See id.* at 14–17.)

Ms. Laiscell does not address the *McDonnell Douglas* factors or present any legal argument supporting her position. In fact, she hardly mentions her failure to promote claim at all. In the Statement of Facts, Ms. Laiscell merely points to evidence that she had never been disciplined; previously received multiple promotions; and that former CFO Ms. Altieri and Executive Director of Elementary and Middle Grades Education Dr. Sandra Inga recommended her for the promotion. (*See* Dkt. 88 (Pl.'s Opp'n) at 4.)

At the first *McDonnell Douglas* step, Ms. Laiscell bears the burden to establish the *prima facie* elements: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012) (citing *Feingold* standard in failure to promote claim). Defendant concedes all elements but the fourth.

17

It is undisputed that Defendant hired a White male for the CFO position. Evidence that the employer promoted a person outside the plaintiff's protected class is sufficient to satisfy the discriminatory intent element at the *prima facie* stage. *See Johnson v. Connecticut*, 798 F. Supp. 2d 379, 387 (D. Conn. 2011) (collecting cases) ("Evidence that a person outside of Plaintiff's protected class was offered the desired position is sufficient for a jury to infer a discriminatory motive"); *Rapp v. Esper*, No. 3:20-cv-272 (KAD), 2023 WL 2666673, at *5 (D. Conn. Mar. 28, 2023) (stating the plaintiff, a Black woman, "easily meets her burden of establishing a *prima facie* case" where "she was rejected for the position, and the position went to … a Caucasian woman"). Accordingly, the Court finds Ms. Laiscell satisfies her burden at the *prima facie* stage.

As for the second step, the Board has the burden to produce evidence that its reason for taking the adverse action is a legitimate, non-discriminatory reason. It is well-established that an employer "is entitled to arrive at a subjective evaluation of a candidate's suitability for a position." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e). The employer may not, however, base its promotion decision "solely on wholly subjective and unarticulated standards." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003).

The Board utilized its standardized hiring process, which included seven standardized questions and, for each question, gave each of the seven interviewers the opportunity to score the candidate on a scale of one through four. (*See* Dkt. 1 ¶¶ 10, 12; Dkt. 15 ¶¶ 10, 12; Dkt. 87 ¶¶ 13, 15–17, 22.) Ms. Laiscell had been

18

promoted through this process and had also served as an interviewer.  (*See* Dkt. 87 ¶¶ 10, 23–24.)  For the CFO position, the interviewers ranked seven candidates and Mr. Fleig received the highest score.  The Board's decision to award the CFO position to the candidate with the highest score is a legitimate, non-discriminatory reason not to hire Ms. Laiscell.

With respect to the third step, Ms. Laiscell must present evidence that shows the Board's proffered legitimate, non-discriminatory reason is pretextual.  She argues that she was the superior candidate because she had never been disciplined, received exemplary performance reviews, had been promoted in the past, and was recommended for the position by the former-CFO and the Executive Director of Elementary and Middle Grades Education.  (Dkt. 88 at 4.)

Ms. Laiscell's long history of strong performance and recommendations, especially from the prior CFO, are certainly attributes making her a highly competitive candidate.  After all, she ranked third out of seven of the final candidates, and presumably many others applied.  However, her strength as a candidate does not entitle her to the job.  "Where a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, the plaintiff's credentials must be 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Haughton v. Town of Cromwell*, No. 3:19-cv-00359 (MPS), 2021 WL 4248858, at *7 (D. Conn. Sept. 17, 2021) (quoting *Byrnie*, 243 F.3d at 103).  Here, Ms. Laiscell's qualifications were not "so superior."  Mr. Fleig had experience

19

outside of the Board and was skilled in forecasting, both which were assets that Superintendent Torres-Rodriguez wanted from her CFO.  (*See* Dkt. 83-4 at Decl. ¶¶ 6–7.)

Ms. Laiscell does not dispute that Mr. Fleig received the highest score. Courts within our district have observed that "[r]elying on subjective criteria is especially permissible where an employee is being considered for a supervisory position." *Rapp*, 2023 WL 2666673, at *5 (collecting cases); *c.f. Cipriano v. Forest Pharm., Inc.*, No. 3:16-CV-01641 (JCH), 2018 WL 11078642, at *7 (D. Conn. Sept. 4, 2018) ("Generally, an employee may not create an issue of fact supporting a finding of pretext by questioning an employer's assessment of her job performance."). "Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of ... qualifications, no inference of discrimination can be drawn.'" *Byrnie*, 243 F.3d at 105 (quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980)).  The interviewers' notes and scores provide a "clear and specific" explanation as to why Mr. Fleig received a higher score.  Accordingly, no reasonable jury would conclude the Board's reason was pretext for discrimination.

The Court also notes that Mr. Griffin's alleged discriminatory animus, as described in Ms. Lee's declaration, does not support her failure to promote claim. Mr. Griffin was not a decision-maker in the promotion process; in fact, Ms. Laiscell supervised him when she temporarily assumed some of the CFO job duties.  (*See* Dkt. 83-7 at Ex. A, 2.)  The only way his animus could be attributable to an adverse employment decision would be under a "cat's paw" liability theory.  *See Vasquez*

20

*v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274 (2d Cir. 2016) (stating a plaintiff can recover if the employer was negligent in allowing a subordinate's "false allegations, and the retaliatory intent behind them, to achieve their desired end"). But this theory would be unavailing, because the Board hired an independent forensic accounting firm to investigate Ms. Laiscell.  No reasonable juror would believe that the Board's decision not to promote Ms. Laiscell was pretextual while there was an open investigation into her alleged wrongdoing <u>and</u> she failed to score the highest on a standard promotion process through which she had received promotions in the past.  *See id.* ("[A]n employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this 'cat's paw' theory, be held accountable for or said to have been 'motivated' by the employee's animus.").  Even if Ms. Laiscell had filed the necessary paperwork to remove her ex-husband from her health insurance plan and the paperwork was not acted upon, her failure to realize her withholding and coverage had not changed for a number of years reflects inattention to her personal financial affairs, validating the panel's opinion that she was not the best candidate.  Put another way, whether the Board placed her on leave, the record does not support a finding that she was the most qualified candidate at the time when they made the promotion decision for three reasons: (1) Ms. Laiscell did not receive the highest score, (2) Mr. Fleig had experience she did not have, and (3) she demonstrated inattentiveness to financial details, a skillset that is critical to a person holding the position of CFO.  For these reasons, summary judgment is GRANTED as to Ms. Laiscell's failure to promote claim.

21

### B.   Termination

In the Complaint, Ms. Laiscell claims the Board unlawfully terminated her in retaliation for filing a CHRO complaint.   Title VII prohibits an employer from discriminating against any individual for filing a charge or complaint.   *See* 42 U.S.C. § 2000e 3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing[.]")

Defendant raises three reasons why summary judgment should be granted as to the retaliation claim.   First, there is no causal connection between the filing of Laiscell's CHRO complaint and her termination because the investigation and disciplinary process were "well underway" when she filed her CHRO complaint. (*See* Dkt. 82-1 at 18–19.)   Second, the Board had a legitimate, non-discriminatory reason for terminating her: fraudulent and unprofessional conduct, including improperly keeping her ex-husband on her health insurance for nearly four years after they divorced, failing to cooperate with the FAS investigation, and failing to save budget files on the shared drive.   Third, Ms. Laiscell cannot establish pretext simply from temporal proximity and her denial of wrongdoing.

Ms. Laiscell's opposition is confusing.   This is in large part because she spends a significant portion of her brief arguing that her termination constituted discrimination on the basis of her race, color and gender. (*See* Dkt. 88 at 17–22.) Ms. Laiscell hardly mentions her CHRO complaint at all, and instead focuses on her belief that Mr. Griffin targeted her when he conducted the audit because she is

22

a Black woman.  (*See* Dkt. 88 at 19.)  Ms. Laiscell argues that Mr. Griffin knew her ex-husband was still on the plan, launched an investigation solely against her, and created a hostile work environment against Black people and women.  (*Id.*)  According to Ms. Laiscell, the Board and human resources knew people complained about Mr. Griffin, but they did nothing.  (*Id.* at 19–20.)  But Ms. Laiscell did not bring a discriminatory termination claim, and in any event Mr. Griffin had left the Board's employ before she was terminated.  (*See* Dkt. 1 ¶¶ 73–75 (asserting discriminatory failure to promote and retaliatory termination claims); Dkt. 87-19 at 12:3–12.)

In the four pages focused on her retaliation claim, Ms. Laiscell contends that no other individual was terminated for Defendant's proffered reasons, i.e., improperly leaving a non-family member on the employee health benefits plan, altering an e-mail, and acting unprofessionally.  (Dkt. 88 at 24.)

To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The Board only challenges the fourth element.

It is well-settled that "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity

and retaliatory action." *Id.*  Because the Board terminated Ms. Laiscell only 2.5 months after she filed her CHRO complaint, the Court finds that she has satisfied her *prima facie* case.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (explaining five months is "not too long to find the causal relationship"); *MacDuff v. Simon Mgmt. Assocs. II, LLC*, No. 3:20CV773 (RAR), 2022 WL 972426, at *11 (D. Conn. Mar. 31, 2022) (finding causal connection established where plaintiff was terminated approximately three months after protected activity); *Dawson v. Security Servs., of Connecticut Inc.*, No. 3:20-CV-01310 (SVN), 2022 WL 17477601, at *10 (D. Conn. Dec. 6, 2022) (finding that two months between protected activity and termination "is enough to establish there was a causal relationship for purposes of satisfying her prima facie case").

With respect to the second *McDonnell Douglas* step, the Court finds the Board has established a legitimate, non-discriminatory reason for terminating Ms. Laiscell.  That is, the basis for terminating Ms. Laiscell was for "unacceptable and wholly unprofessional" conduct to wit: violating the healthcare insurance plan, editing another person's e-mail without consent and distributing it under their name without permission, and improperly saving budget documents. (Dkt. 83-4 at Ex. A).  Unprofessional behavior, violating company rules, and fraud—categories under which the Board contends Ms. Laiscell's conduct falls—are all legitimate, non-discriminatory reasons for terminating an employee. *See, e.g., Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) (work-based disability fraud); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 335 (S.D.N.Y. 2020) (unprofessional behavior and violation of employer's policy); *Moore v. NSTAR*

24

*Elec. & Gas Co.*, 320 F. Supp. 3d 261, 268–69 (D. Mass. 2018) (violation of employer's benefits plan); *LeBlanc v. United Parcel Serv.*, No. 11 Civ. 6983(KPF), 2014 WL 1407706, at *14–15 (violation of employer's integrity policy); *Asiedu v. Broadreach Med. Res.*, 19 Civ. 11825 (ER), 2022 WL 4237077, at *17 (S.D.N.Y. Sept. 13, 2022) (dishonesty); *Campbell v. Nat'l Fuel Gas Dist. Corp.*, No. 13-CV-00438-W(F), 2016 WL 89629078, at *9 (W.D.N.Y. July 26, 2017) (violation of workplace rules and lying). While the Board did not submit any company policies for the Court's consideration, ample precedent about sufficiently similar conduct supports a finding that the Board had legitimate, non-discriminatory reasons for termination.

Ms. Laiscell claims that the proffered reasons for termination are pretextual. First, she argues no other employee had been terminated for failing to take an ineligible dependent off the healthcare plan. (Dkt. 88 at 24.) Second, she argues people routinely changed other people's e-mails. (*Id.*) Third, she argues there is no evidence that she acted unprofessionally when she stored her files on her laptop. (*Id.*)

While the Board described the reason for termination as "unprofessional conduct"—citing multiple examples of such conduct—the Court will assess each example. The Court starts with Ms. Laiscell's failure to remove her husband from her health benefits plan. Ms. Laiscell occupied a leadership position in the financial department, which placed her in a unique position of trust accompanied by an expectation she would follow proper financial procedures. She posits that she overpaid her premiums as a result of her ex-husband improperly remaining on her healthcare plan, (*see* Dkt. 88 at 30)—implying that she did not profit from the error—

25

but as a professional skilled in financial management, Ms. Laiscell knew or should have known that her health insurance coverage and premium, as reflected on her paystub or deposit notice, did not change in the years after her divorce.  As Superintendent Torres-Rodriguez remarked in the termination letter, it "is particularly egregious given [her] stature and position held in the District as the Executive Director of Financial Management," including the fact she "received and [was] aware of very specific information related to the dependent audit."  (Dkt. 83-4 at Ex. A.)  Indeed, it is undisputed that every other employee who improperly kept an ineligible dependent on the employee health benefit plan held a lower-level position than Ms. Laiscell.  (*See* Dkt. 87 ¶ 72.)  Considering the fact the audit was not intended to be punitive and in light of the reasoning proffered in the termination letter, (Dkt. 87-19 at 100:12–20), a reasonable jury would conclude it was precisely Ms. Laiscell's position in leadership that made her conduct worthy of termination.

It may very well be that Ms. Laiscell submitted the proper paperwork to remove her ex-husband from her health insurance.  Assuming this fact is true, Ms. Laiscell still fails to show pretext.  "An employer's good-faith belief that an employee has committed misconduct provides the employer with a nondiscriminatory reason for termination, whether or not the misconduct occurred."  *Honeck v. Nicolock Paving Stones of New England, LLC*, No. 3:04cv1577 (JBA), 2006 WL 2474950, at *7 (D. Conn. Aug. 25, 2006) (citing *Roge*, 257 F.3d at 169).  Ms. Laiscell has not submitted evidence that shows the Board knew she submitted the paperwork to Ms. Bonfiglio or that the financial loss was the fault of someone who was not Ms. Laiscell.  The mere fact that she filed a CHRO

26

complaint did not insulate her from termination. *Craddock v. Little Flower Children & Family Servs. of New* York, No. 12-CV-5062(JS)(GRB), 2016 WL 755631, at *13 (E.D.N.Y. Feb. 25, 2016) (explaining that filing a complaint "does not insulate an employee from subsequent discipline or discharge" nor does it create a presumption of retaliation; rather, plaintiff must show a nexus between the grievance and the adverse action).  Absent evidence showing the Board did <u>not</u> have a good faith belief she committed misconduct, Ms. Laiscell fails to show the Board's decision was pretextual.

With respect to improperly saving budget files on her laptop's hard drive, the Court finds that Ms. Laiscell similarly fails to show pretext.  Ms. Laiscell was responsible for $284 million in general funds, approximately $130 million in annual grant funds, and $80 million in risk-related funds such as worker's compensation and pensions.  (Dkt. 83-3 (Def.'s Mot. Summ. J. Ex. 2, Laiscell Depo.) at 50:1–19.) Given Ms. Laiscell's duties of developing and maintaining the Board's budget as well as overseeing the District's finances, (Dkt. 87 ¶ 4), the budget documents were critically important and her failure to save them on the shared drive could have been catastrophic if her laptop was lost or destroyed.  This is especially problematic since the Board is subject to Freedom of Information Act requirements.  *See* Conn. Gen. Stat. §1-200(1)(A).  In her Local Rule 56(a)(2)(ii) Statement, Ms. Laiscell claims that her laptop was issued by the Board, which was backed-up to the District's cloud automatically.  (*See* Dkt. 87-26 ¶ 48.)  The evidence she cites indicates that the District uses Microsoft OneDrive to automatically backup laptops.  (*See* Dkt. 87-13 at 126:4–12; Dkt. 89-1 ¶ 19.)  However, an individual

27

could save a document locally (and not on the OneDrive) if she is not logged in to her OneDrive account or otherwise dismantles the syncing function.  Ms. Laiscell has not provided evidence that the documents discovered during the investigation were actually properly uploaded on the OneDrive.  A fair reading of the evidence is that Ms. Laiscell maintained some financial records on her laptop's local hard drive as opposed to the Board's shared OneDrive, that some documents were not automatically uploaded onto the OneDrive, and that the laptop's local version  was the only financial record of that type.  If the Board had not investigated Ms. Laiscell, she could have deprived the agency of its access to finances and of its ability to be accountable for its  financial management.[2]  The fact that Ms. Laiscell did not appear to have lost any critical data does not negate the fact that the Board believed she failed to follow protocol for handling and securing critical public records. (*See* Dkt. 83-4 at Ex. 5 ¶ 19; Dkt. 83-7 at Ex. 6 ¶¶ 9–10; Dkt. 87-13 at 125:17–126:12 (explaining documents must be saved on the District's OneDrive).)

The Court expresses no opinion about the altered e-mail issue.  At the time, Ms. Laiscell was Mr. Griffin's interim supervisor and presumably would have had authority to revise his work product.  (*See* Dkt. 87-2 at Ex. A, Laiscell-000039; Dkt. 89-2 ¶ 9.)  Neither party submitted any policies that were purportedly violated.  The record shows that Ms. Laiscell was transparent insofar as she informed Mr. Griffin

---

[2] In her declaration, Ms. Laiscell also stated her "budget files were backed up and protected on the City of Hartford MUNIS financial system."  (Dkt. 89-1 ¶ 19.)  MUNIS' function is unclear, but it is improbable that Ms. Laiscell would have saved all of her documents on a city-wide system that extended beyond her employer.  Furthermore, as with the OneDrive, Ms. Laiscell did not provide evidence that the documents at issue were saved on MUNIS.  Even if she had presented such evidence, the termination was based on other grounds as well.

28

she deleted the sentence at issue, adding, "I hope that's not concerning to you." (Dkt. 83-6 at Ex. E.)  Presumably, Ms. Laiscell would have rectified the deletion if Mr. Griffin was concerned.  However, this does not negate the fact that Ms. Laiscell altered Mr. Griffin's e-mail, sent it to the Superintendent and Deputy Superintendent without notifying them she altered his e-mail, and did so without his consent.  While Ms. Laiscell claims that Mr. Griffin altered the e-mails of his own subordinates, (Dkt.  87-26 (Pl.'s 56(a)(2)(ii) Stmt.) ¶ 23), the evidence she cites merely supports a finding that Mr. Griffin was upset she edited his e-mail.  (*See* Dkt. 87-16 at 31,35 (Vasquez-Matos stating, "[W]ithout the permission of the author of the email, I would not correct it without their permission or ask them to correct it."); Dkt. 87-17 (Pl.'s Tr. Lee Depo.) at 81 (Lee stating Mr. Griffin and Ms. Laiscell worked on the e-mail together and that Griffin "got really mad that she edited it, which she had all the right to do"); Dkt. 89-2 ¶ 23 (Lee stating "it was well-known Griffin had racist and sexist attitudes and beliefs").)  The record therefore indicates the Board believed in good faith that Ms. Laiscell committed misconduct.  *See Honeck*, 2006 WL 2474950, at *7.

Ultimately, the only evidence linking Ms. Laiscell's termination to the filing of her CHRO complaint is temporal proximity.  When a defendant provides a legitimate, non-discriminatory reason for terminating a plaintiff, temporal proximity alone cannot establish pretext. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  Although questions could be raised as to the strength of the Board's three reasons for termination, the Court is not the Board's "super-personnel department." *Delaney*, 766 F.3d at 169.  Accordingly, it must defer to the rational

decision of the employer absent evidence of discrimination by or through the decision maker and may not "reexamine[ the Board's] business decisions." *Id.* For these reasons, the Court finds that no reasonable jury could conclude Ms. Laiscell's CHRO complaint was a but-for cause of her termination. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The Court also notes that Mr. Griffin's apparent discriminatory animus (as described in Ms. Lee's declaration) is not evidence of pretext in this retaliation claim. She posits that Mr. Griffin, her peer and later subordinate, was racist and sexist and sought to get her fired. Even if all of this was true, Mr. Griffin resigned before the independent investigation into Ms. Laiscell's conduct concluded and two months before she was terminated. His memorandum did not include racist, colorist or sexist remarks. There is no evidence to support a finding that he played a pivotal role in the termination decision—on the contrary, the record is replete with evidence that the actual decision makers reached an independent decision. His bias is therefore not causally connected to the investigation results or her eventual termination. It is for this reason that a discriminatory treatment claim—which Ms. Laiscell did not bring but discusses at length in her briefing—would similarly be unavailing based on the record in this case.[3]

C.   Evidentiary Rulings

Ms. Laiscell objected to the declarations from Superintendent Torres-Rodriguez, Ms. Banks, and Mr. Griffin on the grounds that they conflicted with prior

---

[3] For these same reasons, leave to amend—which Plaintiff requested in December 2022 but was denied—would have been futile. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (stating leave to amend should not be granted if amendment would, in relevant part, be futile).

deposition testimony. (*See* Dkt. 88 at 9–16.)  The Court has compared the declarations with the depositions and finds they do not contradict each other. Rather, the declarations provide information that are on similar topics—like, for example, the hiring process, the audit, or the investigation—but is about a slightly different aspect of the topic.  In any event, the Court carefully assessed the evidence and only cited to declarations once it concluded the evidence did not contradict the record.

IV.    CONCLUSION

For the above reasons, the Court GRANTS summary judgment in favor of the Board.  The Clerk is directed to close this case.

IT IS SO ORDERED

Vanessa L. Bryant
Digitally signed by Vanessa L. Bryant
Date: 2023.09.22 15:11:08 -04'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 22, 2023**

31

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOANNA LAISCELL            :

                                   :

v.                              :      NO. 3:20-cv-1463-VLB

                                   :

CITY OF HARTFORD BOARD OF   :

EDUCATION                   :

### JUDGMENT

This action having come before the Court on defendant's Motion for Summary Judgment before the Honorable Vanessa L. Bryant, Senior United States District Judge; the Court having considered the full record of the case including applicable principles of law and having issued a Memorandum of Decision granting defendant's motion; it is hereby

ORDERED, ADJUDGED and DECREED that judgment be and is hereby entered and this case is closed.

Dated at Hartford, Connecticut, this 22nd day of September, 2023.

                                 DINAH MILTON KINNEY, Clerk

                                 By   /S/ Jeremy J. Shafer
                                     Jeremy Shafer
                                     Deputy Clerk

EOD: 9-22-2023

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JoAnna Laiscell**<br>      **Plaintiff,** | : | |
| | : | |
| | : | **No. 20-cv-01463 (VLB)** |
|           **v.** | : | |
| | : | |
| **Board of Education,** *City of* | : | **December 5, 2023** |
| *Hartford,* | : | |
|           **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

### RULING AND ORDER

Plaintiff seeks the Court's reconsideration of its decision granting summary judgment in Defendant's favor.  The Court has reviewed the Plaintiff's brief and finds it fails to satisfy the legal standard.  For the following reasons, the motion is DENIED.

In the Second Circuit, the standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see* D. Conn. L. R. 7(c) (requiring the movant to file along with the motion for reconsideration "a memorandum setting forth concisely the controlling decisions or data the movant believes the Court overlooked").  There are three grounds for granting a motion for reconsideration: (1) "intervening change of controlling law"; (2) "the availability of new evidence"; or (3) a "need to correct a clear error or prevent manifest

1

injustice." *Virgin Atl. Airways Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, *Fed. Practice & Procedure*, § 4478 at 790). If the Court "overlooked controlling decisions or factual matters that were put before it on the underlying motion," reconsideration is appropriate. *Eisemann v. Greene*, 204 F.3d 393, 395 (2d Cir. 2000) (per curium). However, a motion for reconsideration should be denied when the movant "seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257; *Patterson v. Bannish*, No. 3:10-cv-1481 (AWT), 2011 WL 2518749, at *1 (D. Conn. June 23, 2011) (same).

Plaintiff first argues the Court overlooked evidence, because its previous denial of her motion for leave to amend the complaint precluded her ability to present evidence supporting those proposed claims. In short, the Court could not have overlooked evidence that was not introduced simply because it supported claims that were not part of the case. Accordingly, this argument is unavailing.

Plaintiff next rehashes arguments it made in its opposition: (1) Plaintiff was the superior candidate for promotion because she had never been disciplined, received positive performance reviews, had been promoted, was the Acting CFO, and had two letters of recommendation, (Dkt. 95 at 6–7); (2) there was evidence John Griffin had a history of abusive conduct and Defendant claimed he had "dementia," but they nonetheless relied on him to perform the audit, (*id.* at 12–13, 20); (3) there is no evidence Plaintiff knew she needed to remove her husband's information from her health insurance and, in fact, the person responsible was on intermittent medical leave (*id.* at 13); and (4) there is no evidence Plaintiff's alteration of Griffin's work email is a policy violation (*id.*). The Court addressed all

2

of these arguments in its summary judgment decision. Therefore, the Court did not overlook them. (*See* Dkt. 91 at 10, 19–20, 22, 26–30.)

Plaintiff's third argument is the Court improperly employed the summary judgment standard in several instances. Plaintiff is wrong on all accounts. As an initial matter, Plaintiff seems to believe that "[a]ll that is required of Plaintiff, the non-moving party, is to assert what facts support the prima facie case not prove the matter as if it was a trial." (Dkt. 95 at 10.) The Court found that Plaintiff established the *prima facie* case of both her failure to promote and retaliation claims. (*See* Dkt. 91 at 18, 24.) Plaintiff instead failed to present evidence of pretext, which is a higher evidentiary standard than at the *prima facie stage*. (*Id.* at 15, 19–21, 25–30.) Plaintiff also argues the Court improperly relied on *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128 (2d Cir. 2016), a case that addressed judicial estoppel. But this Court cited *Kovaco* for a different and well-established principle: that employment discrimination cases use the *McDonnell Douglas* burden-shifting framework. Next, Plaintiff argues the Court should not have used the *McDonnell Douglas* standard at all, because there is direct evidence of discrimination. (Dkt. 95 at 16–17.) The Court is unaware of and Plaintiff has failed to cite the specific direct evidence in her opposition to summary judgment that the Court failed to consider.[1] Indeed, Plaintiff did not make a single citation to a 56(a) Statement or supporting evidence and therefore has not provided the Court

---

[1] The Court notes that descriptions of evidence do not constitute citations. (*see, e.g.,* Dkt. 95-1 at 14)

3

with any evidence to consider.   Therefore, Plaintiff fails to show the Court overlooked evidence entitling her to reconsideration.

Lastly, Plaintiff improperly raises arguments for the first time.   These include: (1) that she was a public employee entitled to pre-termination notice but Defendant terminated her without a Loudermill hearing, (*id.* at 22–23) and (2) that Defendant should be liable under a cat's paw theory (*id.* at 20–21).[2]  The Court reiterates that Plaintiff cannot use a motion for reconsideration as a "second bite at the apple."  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012); *see also Shrader*, 70 F.3d at 257.  Because the reconsideration standard is long-established and well-known, the motion is denied.

* * *

For the above reasons, the motion is DENIED.

IT IS SO ORDERED

Vanessa L. Bryant
Digitally signed by
Vanessa L. Bryant
Date: 2023.12.05
17:30:44 -05'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: December 5, 2023**

---

[2] Because Plaintiff raises "cat's paw" for the first time in this motion for reconsideration, this Court surmises its discussion of the theory in the summary judgment decision was the likely inspiration.  In the Court's estimation, the facts of the case required discussion of the cat's paw theory at summary judgment, but the Court ultimately found it unavailing.

4